(Darke County, O. Court of Common Pleas.)

## H. G. WALKER AND A. A. IRELAND, ASSIGNEES, v. C. C. WALKER et al.

---

*Right of a failing debtor to prefer one or more creditors—*

1. A failing debtor knowing his insolvency, and in contemplation of making an assignment for the benefit of creditors, may prefer one or more creditors to others, provided he does so in good faith and by means to hinder the other creditors no more than is incidental to the preference, and this may be done by a mortgage delivered to the mortgagee before the deed of assignment is delivered to the probate court.

*Right of a creditor to take a preference from his failing debtor—*

2. A creditor of an insolvent debtor acting in good faith and with a purpose single to his own interest, may take from his failing debtor a preference, even though he know that his debtor is insolvent and knows also that it is the intent of his debtor in giving the preference to him to hinder and delay his other creditors.

*Essential elements in order to maintain a preference—*

3. In order to maintain a preference made by an insolvent debtor, there are three essential elements that the creditor must make appear: First—An adequate consideration. Second—Scrupulous good faith on the part of the creditor. Third—A purpose single and sole to the security of his claim. Without either of these the preference must fall.

*Insolvent debtor making members of his family his preferential creditors, effect—*

4. Where an insolvent debtor makes members of his immediate family his preferential creditors, the transaction is suspicious and calls for the closest scrutiny, and the disclosure of an adequate consideration and the bona fides on the part of the creditors. In all this class of cases the bona fides of the whole transaction is assailed by the creditors, and where so assailed, the burden of proof is upon the creditor not only to show that the preference was upon an adequate consideration, but that it was done in the utmost good faith, and the introduction of the mere formal transfer raises no presumption whatever of good faith.

---

FISHER, J.

It appears that on July 2, 1896. C. C. Walker made a general assignment for the benefit of his creditors, to H. G. Walker and A. A. Ireland; that the deed of assignment was filed with the probate court of Darke county at 11:40 o'clock, a. m., of said date of July 2.

It further appears that prior to the assignment, the said C. C. Walker about June 4, 1896, made to his wife, Mary C. Walker, a note for $6,398.00, due in five years from its date, with six per cent. interest, payable annually, and secured the same by a mortgage of the same date on his home farm in Darke county; that on the same day he executed to his son, H. G. Walker, a note for $4,217.00; to his daughter, Maud Walker, a note for $1,800.00; to his daughter, Nancy Walker, a note for $2,832.00; and to his son-in law, Charles Reid, a note for $715.00, each due in five years with six per cent. interest, payable annually, and secured the same by separate mortgages to each of the same date of the notes, and all on the home farm. except the mortgage to his son-in-law, Reid, which was on a farm in Preble county; that on the day he assigned, and about twenty minutes before the deed of assignment was filed with the probate court,

each of these mortgages, except Reid's, was filed with the recorder of Darke county.

·H. Walker's mortgage was filed at 11:20 a. m., of July 2; Maud Walker's mortgage at 11:30 a. m. ; Nancy Walker's mortgage at 11:32 a. m., and Mary C. Walker's mortgage at 11:35 a. m., of said July 2.

On the 19th day of July, 1896, the assignees filed in the probate court of Darke county their petition to sell the real estate of said insolvent, and which real estate included the land covered by these mortgages, and made all of those having mortgages parties to the suit.

To this petition the defendants, Harry G. Walker, Maud, Nancy, and Mary C. Walker, each filed separate answers setting up their several mortgages. To these answers, or rather cross-petitions, the Second National Bank of Richmond, Indiana, and the Second National Bank of Greenville, Ohio, being creditors of the said C. C. Walker, filed answers averring that they are creditors of the said C. C. Walker, and asked to have these mortgages set aside on the ground that they were fraudulent and made for the purpose and with the intent to hinder, delay and defraud creditors. To these answers the Walkers made denial in separate replies, of all matters and things charging them with fraud, or with intent to hinder, delay and defraud the creditors of the said C. C. Walker.

Upon the issues joined on the cross-petition of the Walkers the answers and replies thereto, a trial was held in the probate court, and a finding was made in favor of the mortgagees severally, and finding also the amount due on the mortgages, and fixing the priorities of the liens. From these findings and decrees the Second National Bank of Richmond and the Second National Bank of Greenville appealed to this court.

On February 13. 1897, by leave of the court, the Second National Bank of Green ville, filed amended answers to the cross-petitions of the said Walkers, to which, by leave of the court, the said Walkers filed replies, and upon these cross-petitions and amended answers of said Banks, and the replies thereto, the causes were tried as if originally begun in this court.

The law is well settled in Ohio that a failing debtor. knowing his insolvency, and in contemplation of making an assignment for the benefit of creditors, may prefer one or more creditors to others, provided he does so in good faith and by means to hinder the other creditors no more than is incidental to the preference, and this may be done by a mortgage delivered to the mortgagee before the deed of assignment is delivered to the probate judge. Cross v. Carstens, 49 Ohio St., 548.

It is equally as well settled that a creditor acting in good faith and with a purpose single to his own interest, may take from his failing debtor a preference, even though he knows that his debtor is insolvent, and knows also that it is the intent of his debtor in giving the preference to him to hinder

and delay his other creditors. Brinkerhoff v. Tracy, 37 Bulletin 121.

In other words, a vigilant creditor, acting in good faith, with no other motive, purpose or intent than to secure his debt, may protect his claim by a preference at the very time of an assignment by his debtor. If he does other than this, his preference will not be protected and must fall, as being made with intent to hinder, delay and defraud creditors.

In order to maintain a preference of this kind, there are three essential elements that the creditor must make appear:

First—An adequate consideration.

Second—Scrupulous good faith on the part of the creditor.

Third—A purpose single and sole to the security of his claim.

Without either of these the preference must fall. Loudenback v. Foster, 39 Ohio St., 203; Justice v. Uhl, 10 Ohio St., 170, 178; Pendery v. Allen, 50 Ohio St., 121; Harkrader v. Leiby, 4 Ohio St., 602, 611; O'Connell v. Cruise, 1 Handy, 164; Brooks v. Todd, 1 Handy, 164; Brooks v. Todd, 1 Handy, 169: Hoffman et al. v. Mackall, et al., 5 Ohio St., 124.

Sec. 6344 provides that "All transfers, conveyances, or assignments made by a debtor or procured by him to be made, with intent to hinder, delay or defraud creditors, shall be declared void at the suit of any creditor." This section as has appeared by the authorities cited, has been frequently construed, and in no way limits, but on the contrary broadens the equitable power of the courts to inquire into and grant relief against fraudulent preferences.

Constructive fraud is equally as reprehensible as actual fraud, and may be relieved against: Brinkerhoff v. Tracy, 56 Ohio St., 37 Bulletin, 121, 13; Loudenback v. Foster, 39 Ohio St., 203, 206.

In discussing these statutes, Ranney, J., in the case of Harkrader v. Leiby, 4 Ohio St., 602, above cited, on page 610, says: "This statute is of the most beneficial character, and the uniform language of the courts has been that it ought to receive a most liberal construction. It promotes justice and equity by compelling an equal distribution of the effects of an insolvent debtor among those equally entitled. It permits every creditor of such a debtor to reap the rewards of his diligence where he does no more than to secure himself; but denies him the right to stand between the insolvent and some of his other creditors, and secures them a preference to the injury of those not provided for. It allows the debtor to use his property for the payment or security of any of his debts, but the moment he attempts to create a trust with the preference for any of his creditors by surrendering any of his property in any form, the statute steps in and declares it a trust for all. As soon as he puts any portion of his property beyond his power for such a purpose, the law deprives him of all ability to direct or control his ultimate destination. It deprived him

of his power because it was found to be mischievous and unjust; and as the statute was passed to furnish the remedy, it should be construed so as to make it effectual. This can only be done by looking at its spirit and purpose, and holding cases falling within the mischief intended to be remedied, to be within the act.''

The same construction given to sec. 6343 is applicable to sec. 6344. These rules here announced have been approved by a score of cases in Ohio. Judge Gholson in the case of Justice v. Uhl above cited, page 177, says: ''The cases arising under the statute will be classed under two heads: ''First—Where there is an assignment to the third person, or to one or more creditors, and there is a trust superadded to prefer other persons in payment of debts due to them. Second—Where there is an assignment to creditors to prefer them, and also a trust superadded for the benefit of the assignor, or to accomplish some purpose desired by him other than the preference of the creditors to whom the assignment has been made. It is true that assignments falling under the second class would generally be invalidated as to any right of preference upon the ground of fraud, but the circumstance that the assignment in trust was fraudulent does not prevent the operation of the statute.''

In the case of Atkinson v. Jordan, 5 Ohio, 293, 294, Wright, J., in discussing the question of fraud in preferential mortgages, among other things says: ''It is said the genius of the common law opposes itself to every species of fraud, and the most solemn acts, even judicial proceedings, if tinctured with it, are held to be vicious and unavailing. While the multiplied and ever varying relations of society refine the arts of deceit and the intricacy of legal transfers and proceedings, multiply the means of fraud and increase the difficulty of tracing and fixing the fraudulent connection between the original act and the ultimate purpose, they invoke the gracious vigilance of the law in scrutinizing colorable and equivocal transactions, and require of courts in deciding upon them to have some regard to public utility. It seems admitted that a debtor in failing circumstances, may, in good faith, pay one creditor in money or goods in preference to another; but the frequent abuses practiced in transfers to effect a preference by means of trust instead of actual payment, have led many to doubt the policy of holding transfers valid. As a general proposition, it will not be denied that persons so situated are legally bound to good faith between themselves and their preferred creditors, and moreover, to avoid any transactions connected with the placing of their effects beyond the reach of legal process, all bad faith in respect to other persons standing in the relations to be affected by them.''

In the case of Fasett v. Traver, 20 Ohio, 540, in discussing the question, the judge at page 545, says: ''A creditor has a right to secure himself by obtaining a lien on the property of a failing debtor, and if done fairly he may then obtain a preference over other creditors, The creditor must act solely for the purpose of securing himself without interposing any barrier to the rights of others except such as may be necessary to effect that object.''

In the case of O'Connell v. Cruise, above cited, Gholson, J., commencing on page 165, lays down the rule in these words: ''The property of a failing debtor, in the eye of the law, belongs to his creditors, and in any disposition he may make of it he must look to their right and their security. * * * There are two kinds of assignments; one preferring particular creditors, which is not looked on with favor; and the other for all the creditors, which is.''

In the case of Brooks v. Todd, above cited, the same judge says: ''A failing debtor may prefer in Ohio, but the transaction is deemed unjust, and it must be free from any just suspicion as to its honesty and fairness. The parties are required to act with the most scrupulous good faith, and look with an eye single to the objects intended, a fair sale or security to satisfy or provide for the debt to be preferred; and they must take care that no unjust or unnecessary delay or hindrance be offered to the rights of others.''

The doctrine here laid down in reference to preferential creditors by an insolvent debtor, is approved broadly in the latest Ohio cases. Cross v. Carstens, 49 Ohio St., 548; Pendery v. Allen, 50 Ohio St., 121, 129; Brinkerhoff v. Tracy, 56 Ohio St., 13; Lee et al. v. Hennick et al., 52 Ohio St., 177.

The authorities are also uniform in holding that where an insolvent debtor makes members of his immediate family his preferential creditors, the transaction is suspicious and calls for the closest scrutiny, and the disclosure of an adequate consideration and the bona fides on the part of the creditor. In all this class of cases the bona fides of the whole transaction is assailed by the creditors, and where so assailed, the burden of proof is upon the creditor, not only to show that the preference was upon an adequate consideration, but that it was done in the utmost good faith, and the introduction of the mere formal transfer raises no presumption whatever of good faith. Ferguson v. Gilbert et al., 16 Ohio St., 88-96, 97; Langley v. Berry, 14 N. H., 82.

Judge Gholson in the case of Justice v. Uhl, 10 Ohio St., 170, says: ''It would, indeed, be difficult to determine what particular acts agreed to be done in reference to the property would constitute such a trust as to bring the acts within the statute. It may be observed generally that such acts as those which have been referred to are in their nature equivocal, and their construction and effect might depend very much upon the circumstances of the case '' In other words, that each case must be determined upon its own facts and circumstances as measured by

the rules here announced. Keeping in view, therefore, the rules announced by the courts in relation to preferential creditors, let us examine in regard to the mortgage of H. G. Walker.

That C. C. Walker at the time he made the mortgage to his son, Harry G., and his daughters and wife, was insolvent, and that he made this mortgage and all the others with the fraudulent intent and purpose of cheating, hindering, and delaying his creditors, is clearly established by the evidence and surrounding circumstances offered in evidence, and I do not understand that this is seriously contested by counsel for the preferred creditors. Brinkerhoff v. Tracy, 56 Ohio St., 37 Bulletin 121.

That H G. Walker knew, before the execution and delivery of the note and mortgage to him, that his father was insolvent, and that his father made the mortgage with the intent to delay, hinder and defraud his creditors, is clearly and satisfactorily established by the evidence. His close relationship to his father as a partner and a son, and to his sisters; his want of candor in his testimony; his connection with his father in the procurement of the fraudulent acknowledgment of the Reid mortgage; his keeping his mortgage off record; his statement to the witnesses, Reid and Butt, that "the old man was loaded," that "they had prepared to save the home farm," and many other facts and circumstances appearing throughout the case, satisfy the court that the intimacy between the father and son was not broken off just at the time of the assignment, but that the son knew of the plans, purposes and desires of his father to save for himself and his family the home farm.

Does the evidence show that Harry aided his father in these designs? The court has carefully read and considered all the evidence offered in the case, and cannot avoid the conviction that it clearly shows that the making of these notes and mortgages by C. C. Walker to his children was a family arrangement, and was so understood by the children. That C. C. Walker was the mover in the matter, and directed and planned the settlement; that his son Harry was his trusted companion; that the mortgages were given and received, not for the sole purpose of securing valid debts due the children, but for the principal purpose of aiding the father to keep the home farm in the family, so that he might enjoy its beneficial fruits, a purpose desired by him and them, other than the preference of creditors, and a purpose which the courts hold is in fraud of his unsecured creditors' rights, and tending to hinder and delay them in the collection of their debts.

The apparent effort of the children to avoid obtaining any information in the family as to this particular business; the effort to avoid knowledge by each as to what the others were doing in regard thereto; the want of knowledge as to the existence of the others' claims; the total absence of any communication between each other in the family upon matters of all others most natural to be discussed in the family circle; the separate and apparently secret arrangement of each for wages without the other's knowledge; the accidental unanimous determination without the knowledge of either to have a settlement with their father on the 5th day of March, 1895; the accidental meeting growing out of this separate determination without concert of action, on March 5, 1895; the accidental selection of Miss Maud to make the settlement for each without the others' knowledge; the accidental meeting and calculation of June 4, 1896; which was a few days after notice from the Greenville Bank; the accidental with-holding of the mortgages from record, by which, without the knowledge, request or concert of action from the others; the accidental delivery of them to the others twenty eight days after their delivery to them, for her to carry them to Greenville for record; the accident that they were delivered to the mother on the day of the assignment without the knowledge of either of the mortgagees that the assignment was to take place; the making of the $1,075.00 note and mortgage to the Reids; the apparent want of knowledge as to this questionable transaction; the dating of it back; the procuring of the antedated acknowledgment and filing for record; the suspicious character of the notes; the apparent want of candor throughout the testimony of the mortgagees upon all matters touching the transactions—either of these taken separately would not warrant the presumption that either of the mortgagees aided the father in his fraudulent designs, but when taken together with the fact of the design of the father, the conclusion cannot be avoided that the father was aided in the design to defraud the creditors, by the children, and especially H. G. Walker; and the preference given to H. G. Walker must fail. Irish v. Bradford, 64 Iowa, 302; Besson v. Evelen, 26 N. J. Eq., 468; Billings v. Russell, 101 N. Y., 226. For the same reasons the mortgages of Maud and Nancy must fail.

And the fact that the notes and mortgages were founded on an adequate consideration would not change the rule.

The court in the case of Schmit v. Opie et al., 33 N. J. Eq., 138, says: "If a mortgagor execute a mortgage for a fraudulent purpose, and the mortgagee accepts it with the knowledge of the mortgagor's purpose, intending to aid him in such purpose, the mortgage will be held void as against those who are defrauded by it, even if it is founded on a perfect consideration."

The circumstances of the family and their manner of living at the time these contracts for services are claimed to have been made; the open handed liberality in which the father and mother shared with the children the income and advantages of the farm; the very meager testimony about the making of the contracts; the uncertainty as to the terms, etc., when the law requires that such contracts must be expressed and clearly

proved; the payment of wages, whether services were rendered or not; the want of knowledge of either of the children that the others had such contracts or were working for wages; tho fact that the children whose business sagacity had led them to demand of their father wages for services, had afterwards for years neglected or hesitated to demand pay of the father; that no account was kept of wages earned or other items; the singular circumstance that such contracts were kept secret from the others by father and mother, are all against the theory that these children, as soon as they came of age, demanded of their father a contract to pay them wages for what services they might render him while they remained in the family.

The fact that Harry, as he claims, was a full partner with his father from about the time he was sixteen years old, in the stock business—sheep, cattle, and hogs, which was extensive—and continued so in partnership until the assignment; that the father furnished the entire capital, feed, pasturage, stabling, machinery, hired help, and other assistance; the fact that for all these years he received his clothes, board and spending money from his father without charge; the fact that at the time of the assignment he claimed and owned quite a large part of the stock and other property then upon the farm, are against the formation of a belief that in addition to all these he was to receive from his father, under an express agreement, for his services, wages at the rate of $250.00 per year.

For what services did these wages pay? The court thinks the evidence when read and considered as an entirety, as regards the relation of these children to their father, clearly shows that the idea that there was an agreement between the father and the children in reference to the pay for services, originated in the mind of C. C. Walker about the third or fourth day of June, 1896. The desire of the father, and probably of the mother, to save something for themselves and their children out of the wreck, no doubt prompted the belief that he at some time had entered into such a contract with his children.

Such contracts as detailed under the circumstances in this case, are, in the language of the court, "extremely suspicious," and a court should not uphold them in the face of the rights of creditors, unless, as the law requires, they are satisfactorily proved. I do not think that the mother's testimony aids in making out these contracts. She says that she was present at each time as each child became of age and entered into the contract with the father, but she does not give such information as shows the existence of a binding or legal contract, taken with the other circumstances, evidence, acts and declarations of the parties, as would entitle the child to recover in a suit at law.

Harry testifies that at the time of his assignment his father owed him on account of partnership stock sold, over $3,000.00. This was a valid debt and justly due him from his father, according to his own testimony, and yet he did nothing and said nothing to his father about securing this claim; no effort was made to have his father secure it; no demand was made in relation to it. The only thing that was looked after about the 4th of June, 1896, was the claim for wages for Harry, extending back to the time of his becoming of age.

It is not necessary to enter into the discussion of the execution of the notes dated March 5, 1895, further than to say that the fact that they are, including the mother's note, exact copies, save as to amounts and dates of the notes drawn by Mr. McKemy in his office at Dayton, Ohio, June 4, 1896—rare and unusal form of notes in phraseology, and clearly the wording of a lawyer— is a striking coincidence, and it becomes more striking when we are informed that the notes were drawn by a person without any experience in such matters. What appears as to these notes also appears as to the mortgage, the acknowledgment of which was antedated. It is an exact copy of the mortgage drafted by Mr. McKemy.

McKemy could not have obtained his form of notes from these notes made in March, 1895, because his form is printed; and then the evidence is by all the defendants that they did not entrust their notes to their father when he went to Dayton to fix up the business, but only gave him the amounts due each of them, and when he came back and delivered to them the notes and mortgages they surrendered to him their old notes. The words, "paid June 4 1896," written on the face of the notes of March 5, appear, when submitted to a strong glass, to have been put there at about the time the notes were drawn, or a short time thereafter and before the notes became creased or worn, as the ink does not enter the fiber of the paper where the letters cross the creases.

Under the evidence, therefore, the court is forced to conclude that as far as the notes given to H. G. Walker, Maud and Nancy Walker, express a claim for services, they are without any real consideration, and void.

As to the claim of Mary C. Walker, the court is satisfied from the evidence that she received from her father's estate about the year 1863, $3,000.00; that the money went into the hands of her husband, and that the note given June 4, 1896, was given as the evidence of that money and interest, and that the note is supported by a valid consideration.

Inasmuch, however, as the court has found that the mortgage given to H. G., Maude and Nancy Walker were given and taken with the intent to hinder and delay creditors, it is not necessary for the court to consider what knowledge Mrs. Walker had of her husband's designs, and what participation she took in the carrying out of these designs on the part of her husband and her children, or what effect such a participation and knowledge in the fraudulent acts of the

husband and children in relation to their own mortgages unconnected with her own, had upon the validity of her mortgage, because her mortgage becomes a nullity, by reason of the law which relates the finding of the court back to the consummation of the fraud, which was the filing of the mortgage of H. G. Walker for record at 11:20 o'clock a. m., of July 2, 1896, and prior to the filing of the mortgage given to Mrs. Walker, by fifteen minutes. The act of the filing of the Harry Walker mortgage was the consummation of the fraud against the creditors of C. C. Walker, and by virtue of that act it became an assignment for the benefit of all the creditors, and for the purpose of distribution relates to the time of filing the mortgage with the recorder. Bloomingdale v. Stein, 42 Ohio St., 168-173.

This case has lately been followed and approved by our own circuit court, but not reported. Same doctrine is announced in Betz v. Snyder, 48 Ohio St., 492.

The finding of the court is that the mortgage given to H. G. Walker was made with the intent to delay, hinder and defraud creditors, and is therefore void, and the same is set aside. The judgment of the court is, that the mortgages of Harry, Maud, Nancy and Mary C. Walker, are fraudulent and void. And it is ordered that a copy of the entry and decree herein of the court be certified to the probate court for the administration of the trust.

. Jas. A. Gilmore and Thos. Study, Attorneys for Walkers.

Anderson & Bowman, J. C. Allread, M. B. Trainor and Jackson & Starr, Attorneys for Banks.